# In the United States Court of Federal Claims

## OFFICE OF SPECIAL MASTERS
### No. 02-226V
### E-Filed: April 26, 2013

* * * * * * * * * * * * * *
                               *

ANTHONY REID,                   *         Chief Special Master
                               *         Campbell-Smith
                               *

                               *         Fact Finding; Hepatitis B
                               *         vaccines; Alleged Injuries
                               *         include: Changes in Stool,
                               *         Exercise-Induced Asthma,
v.                              *         Fatigue, Muscle Twitches,
                               *         Fainting Episodes, Sound and
SECRETARY OF HEALTH     *         Smell Sensitivity, and Dry
AND HUMAN SERVICES,     *         Eyes
                               *
                               *
            Respondent.        * 
                               *

* * * * * * * * * * * * * *

## RULING REGARDING FACTUAL FINDINGS[1]

On March 22, 2002, petitioner Linda Reid (petitioner or Ms. Reid) filed a petition on behalf of her minor son, Anthony, seeking compensation under the

---

[1]      Because this decision contains a reasoned explanation for the undersigned's action in this case, the undersigned intends to post this ruling on the United States Court of Federal Claims' website, in accordance with the E-Government Act of 2002, Pub. L. No. 107-347, § 205, 116 Stat. 2899, 2913 (codified as amended at 44 U.S.C. § 3501 note (2006)). As provided by Vaccine Rule 18(b), each party has 14 days within which to request redaction "of any information furnished by that party: (1) that is a trade secret or commercial or financial in substance and is privileged or confidential; or (2) that includes medical files or similar files, the disclosure of which would constitute a clearly unwarranted invasion of privacy." Vaccine Rule 18(b).

National Vaccine Injury Compensation Program (the Program).[2]  Petitioner alleges that Anthony experienced a number of adverse effects as a result of the vaccines he received on December 19, 2000, and January 17, 2001.  Petitioner asserts that the administered hepatitis B vaccines caused changes in the appearance of her son's stools, exercise-induced asthma, and fatigue.  Pet. at 2.  Alternatively, petitioner claims that Anthony suffered from muscle twitches, fainting episodes, sound and smell sensitivity, shaking episodes, and dry eyes, as a result of the mercury-containing preservative thimerosal added to the hepatitis B vaccine he received on December 19, 2000.  Pet'r's Ex. 42.  At the time Anthony received his first hepatitis B vaccine, he also received the measles, mumps, and rubella (MMR), inactivated polio (IPV), and tetanus-diphtheria acellular pertussis (TDaP) vaccines.  Pet'r's Ex. 42.

In support of the allegation that Anthony suffered various vaccine-related injuries, petitioner filed the following documents: (1) affidavits and a narrative she prepared, Pet'r's Ex. 2, 18, 32, 40, 66; (2) statements from Anthony's father (Anthony Reid, Sr.), Anthony's grandmother (Rosa Reid), Anthony's brother (Adrian Artis), and the family's neighbor (Sharon Phillips), Pet'r's Ex. 20, 21, 22, 23, 61; (3) petitioner's pregnancy records, Pet'r's Ex. 11, 14, 16; (4) Anthony's earliest pediatric records,  Pet'r's Ex. 2, 4, 6, 7, 10, 17, 29, 31, 36, 52; (5) Anthony's later pediatric records, Pet'r's Ex. 3, 19, 25, 26, 27, 30, 35, 37, 39, 43, 49, 50, 51, 55, 56, 57, 58; (6) Anthony's immunization records, Pet'r's Ex. 12, 13; (7) a VAERS Report, Pet'r's Ex. 67, (8) a medical referral for homebound instruction and school documents pertaining to homebound instruction, Pet'r's Ex. 8, 34, 38, 65; (9) Anthony's school attendance records, Pet'r's Ex. 62, 63, 64; (10) expert reports from Dr. Joseph Bellanti, Pet'r's Ex. 24, 44, 54, and Dr. Mary Megson, Pet'r's Ex. 42; and (11) medical literature alleged to support petitioner's claim, Pet'r's Ex. 45, 54.

The undersigned conducted a fact hearing in Washington, D.C. on June 13, 2012, to resolve certain fact issues that emerged during the case's development.  At the hearing, petitioner, her husband, and her son Anthony testified regarding Anthony's state of health before and after his receipt of the hepatitis B vaccine on December 19, 2000, and January 17, 2001, respectively.

I.    DISCUSSION

A.  The Documentary Record

---

[2]      The Program comprises Part 2 of the National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3758, codified as amended, 42 U.S.C. §§ 300aa-10 et seq. (hereinafter "Vaccine Act" or "the Act").  Hereinafter, individual section references will be to 42 U.S.C. § 300aa of the Act.

Anthony Reid was born on March 25, 1992, at Wayne Memorial Hospital in North Carolina. Pet'r's Ex. 16. He was discharged two days after his birth, on March 27, 1992, as a well infant. Id.

On December 19, 2000, Anthony received his first administration of the hepatitis B vaccine, as well as the MMR, IPV, and TDaP vaccines. Pet'r's Ex. 12. One month later, on January 17, 2001, Anthony received his second administration of the hepatitis B vaccine. Pet'r's Ex. 12. He was eight years of age. Pet'r's Ex. 16.

On February 23, 2001, nearly one month after Anthony's second hepatitis B vaccine, petitioner took Anthony to see Dr. Gary Santora, a chiropractor. Pet'r's Ex. 26. At that time, Anthony presented with complaints of sharp, stabbing headaches. Id. No diagnostic impression was offered. Id.

Nearly eight months after his second hepatitis B vaccination, on August 23, 2001, Anthony was taken to Patient First Medical Center (Patient First) complaining about tightness in his chest and difficulty breathing. Pet'r's Ex. 15.

Two months thereafter, on October 30, 2001, petitioner took Anthony to see Dr. Mary Megson, a developmental pediatrician, for an evaluation of his reaction to the hepatitis B vaccine he had received ten months earlier. Pet'r's Ex. 2. During this visit Dr. Megson recommended laboratory testing and submitting a report to the Vaccine Adverse Event Reporting System (VAERS). Id.

The recommended lab work was performed, and Dr. Megson determined that Anthony's hair showed elevated levels of aluminum, arsenic, antimony, cadmium, lead, and thallium. Pet'r's Ex. 29. More lab work was performed, and on January 4, 2002, Dr. Megson advised that no further medical intervention was necessary based on the results. Id.

Later that month, by letter dated January 10, 2002, Dr. Donald Sanders of Midlothian Family Practice, informed the Reids that medical care would no longer be provided for Anthony or his sister Alexis. Pet'r's Ex. 28. Dr. Sanders voiced particular concern about the excessive number of emergency room and Patient First visits for Anthony and Alexis. Id.

Petitioner took Anthony back to Dr. Megson on January 24, 2002, more than one year after his second hepatitis B vaccination, complaining of recent nausea and fatigue. Pet'r's Ex. 42. Dr. Megson speculated that Anthony could have experienced thimerosal toxicity, noting that Anthony had developed a bout of severe asthma after receiving his second hepatitis B vaccine. Id.

3

On March 14, 2002, nearly two months after the visit to Dr. Megson during which the possibility of thimerosal toxicity was considered, Anthony was diagnosed with heart palpitations. Pet'r's Ex. 3. One week later, on March 22, 2002, petitioner filed this vaccine claim. Pet. at 2.

Two months after the filing of the vaccine claim and fourteen months after Anthony's second hepatitis B vaccination, Anthony was diagnosed with exercise-induced asthma. Pet'r's Ex. 17.

Nearly one year later, on April 13, 2003, a computerized tomography (CT) scan was taken of Anthony's upper body to investigate his ongoing complaints of twitching, chest pain, and throat pain. [3] Id. Dr. Carlisle Morgan, the radiologist who reviewed the CT scan, determined that Anthony's heart and other mediastinal structures appeared normal. Id.

On April 14, 2003, more than two years after Anthony's second hepatitis B vaccination, petitioner took Anthony for an evaluation by Dr. Donald Taylor, a pediatric neurologist, for possible seizures and chest pain. Pet'r's Ex. 19. A CT scan was taken of Anthony's brain, and during the consultation, Dr. Taylor indicated that the episodes of numbness with twitching that Anthony was experiencing might reflect an anxiety or hyperventilation response, but did not support a finding that Anthony was seizing. Id. Dr. Taylor recommended a further assessment of Anthony's symptoms. Id. The next day, Dr. Taylor performed an electroencephalogram (EEG). [4] Pet'r's Ex. 49. He noted that

---

[3]  A CT scan of the brain consists of a computerized analysis of multiple tomographic x-ray images taken of the brain tissue at successive layers, providing a three-dimensional view of the cranial contents. The CT image provides a view of the head as if one were looking down through its top. The variation in density of each tissue allows for variable penetration of the x-ray beam. An attached computer calculates the amount of x-ray penetration of each tissue and displays the calculations as shades of gray. The image is placed on a television screen and photographed. The final result is a series of anatomic pictures of coronal and sagittal sections of the brain. Mosby's Manual of Diagnostic and Laboratory Tests 1080 (4th ed. 2010).

[4]  An EEG of the brain is the recording of potential on the skull generated by currents emanating spontaneously from the nerve cells in the brain. Fluctuations in potential are seen in the form of waves, which correlate well with different neurological conditions and so are used as diagnostic criteria. Dorland's Illustrated Medical Dictionary 607 (31st ed. 2007).

4

Anthony suffered some jerking movement during the recording, but his test results were normal.  Id.

One week later, petitioner took Anthony to Patient First for complaints of loss of movement in his arms and legs.  Pet'r's Ex. 30.  The examining physician, Dr. Ivia Somerville, a family physician, recommended lab work and a consultation with a neurologist.  Id.

Nearly four months later, on August 30, 2003, Anthony was diagnosed as having probable floppy eyelid syndrome after a consultation with Dr. Thomas Carothers, an ophthalmologist.  Pet'r's Ex. 31.  Dr. Carothers recommended the administration of antihistaminic eye drops and a follow-up appointment in one month.  Id.

On September 3, 2003, four days after seeing Dr. Carothers, petitioner took Anthony back to see Dr. Megson.  During this visit, Dr. Megson noted that Anthony was experiencing shaking episodes, chronic fatigue, dry eyes that required artificial tears, and stomach aches.  Pet'r's Ex. 42.  These symptoms persisted during his follow-up visit on November 4, 2003.  Id.

Three weeks later on September 24, 2003, Anthony was admitted to Chippenham and Johnston Willis Medical Center experiencing periods of body numbness, but was discharged a couple of hours later.  Pet'r's Ex. 42.  About two weeks later Anthony was admitted again to Chippenham and Johnston Willis Medical Center complaining of twitching, paralysis, and unresponsiveness.  Id.

On October 17, 2003, nearly five weeks after Anthony had returned to Dr. Megson for a follow-up exam, petitioner's husband took Anthony to Patient First because he had collapsed and begun to experience numbness on one side of his body after going outside into cold weather on his way to school.  Pet'r's Ex. 30.  Two weeks later, on October 28, 2003, Dr. Somerville, a family practitioner at Patient First, wrote a letter that described the nature and duration of Anthony's symptoms in support of the family's request for homebound instruction.  Pet'r's Ex. 36.  Dr. Somerville encouraged Anthony to receive a psychological evaluation.  Id.  Two months later, on November 17, 2003, the Chesterfield Public School System granted the request for Anthony's homebound instruction, based on a determination that Anthony was physically unable to attend school regularly.[5] Pet'r's Ex. 34.

---

[5]     A letter dated November 20, 2003, from Chesterfield County Public schools was addressed to the Reids indicating that Anthony had fourteen unexcused absences for the school year.  Pet'r's Ex. 64.

Nearly one year later, on October 18, 2004, petitioner took Anthony to Patient First to complete paperwork releasing him to return to school. Pet'r's Ex. 50. A health services plan was implemented on October 18, 2004, containing a health alert that informed Anthony's teachers of his condition. Pet'r's Ex. 65. On November 24, 2004, two days after Anthony was seen in the emergency room for questionable seizure activity at home, Dr. Somerville again saw Anthony at Patient First. Id. She noted that he had suffered a fainting episode the day before, and that Anthony was having difficulty swallowing. Id.

A month later, on December 22, 2004, Anthony returned to Patient First because he had fainted while watching television. Id. Two weeks later, on January 4, 2005, Anthony's parents requested paperwork for homebound instruction because Anthony's health issues had become too disruptive for school attendance. Id. On April 6, 2005, Anthony went back to Patient First to have the new homebound forms completed.[6] Pet'r's Ex. 38. At that time, Dr. Somerville noted no change in Anthony's condition; she further observed that Anthony continued to have involuntary movements periodically that were triggered by noises and smells. Id.

On April 27, 2005, Anthony underwent a neuropsychological evaluation at Children's Hospital in Richmond, Virginia. Pet'r's Ex. 43. Dr. Gail Argenbright, the licensed clinical psychologist who examined Anthony, found that he had mild attentional problems and appeared to have significant difficulty with his fine motor coordination when compared to other children of his age. Id. Anthony exhibited mild anxiety, but had no significant mood disorders. He also appeared to be socially and emotionally well-adjusted at home. Id.

In October of 2005, Anthony was examined again at Patient First for allergy symptoms, congestion, occasional headaches, and a painful knot on his left chest wall. Pet'r's Ex. 49.

On March 28, 2006, Anthony saw Dr. John Teasley, a pediatric neurologist. Pet'r's Ex. 43. Dr. Teasley was of the impression that Anthony had a migraine variant, parasomnias, and suffered from restless leg syndrome. Id. The next month, on April 3, 2006, Anthony had a MRI at Chippenham Medical Center,

---

[6] Different dates appear on these forms. Dr. Somerville noted in her records that she had completed the paperwork for early January to mid June, but that the paperwork had to be redone. Pet'r's Ex. 38.

which revealed mild left-sided plagiocephaly.[7] Id. The imaging showed no difference from the previous CT scans in 2004. Id.

On November 30, 2006, Anthony sought treatment at Chippenham Medical Center for a painful headache and nose bleeds. Pet'r's Ex. 51. A CT scan showed no acute abnormalities. Id.

On July 25, 2007, Anthony was treated at Patient First for knee pain from a football injury. Pet'r's Ex. 50. Anthony returned on November 1, 2007, complaining of a progressively worsening sore throat. Id.

On November 16, 2009, Anthony had a routine, sports physical. Pet'r's Ex. 58. During that physical, Dr. Somerville noted that Anthony had not had any complaints or problems for a few years. Id.

On March 16, 2010, Anthony sought treatment at Chippenham Medical Center for a headache. Pet'r's Ex. 56. The examining doctors suspected that Anthony was suffering from a tension headache or a migraine due to an accompanying light sensitivity. Id.

On September 22, 2011, Anthony was admitted to Chippenham and Johnston Willis Medical Center for facial pain and numbness. Pet'r's Ex. 59. Anthony was discharged that same day, diagnosed with a headache, and instructed to follow up with his primary care physician. Id. Two days later, Anthony was admitted again for the same symptoms, but his CT scan results were negative. Id.

### B. The Witnesses' Testimony

Petitioner, Mr. Reid (Anthony's father), and Anthony testified during the fact hearing. Petitioner testified first. Petitioner and Mr. Reid described Anthony's health prior to and after his receipt of the subject vaccines. Anthony described the symptoms he experienced to the best of his limited recollection.

### 1. Mrs. Linda Reid

Mrs. Reid began her testimony describing Anthony's health before he received the hepatitis B vaccine. She testified that Anthony was healthy at his birth. Tr. at 73. She stated that other than experiencing common childhood illnesses, including allergies, upper respiratory tract infections, ear infections, and a rash after receiving the chicken pox vaccine, Anthony had no notable medical

---

[7] Plagiocephaly is an asymmetric condition of the head, resulting from irregular closure of the cranial sutures. Dorland's Illustrated Medical Dictionary 1473 (31st ed. 2007).

issues prior to receiving the hepatitis B vaccine series. Id. at 74. She did acknowledge that prior to Anthony's receipt of the hepatitis B vaccinations, he had a history of bronchitis and sinus issues. Id. at 86. She also acknowledged that in 1997, three years before his hepatitis B vaccinations, he was diagnosed with questionable asthma. Id. at 86.

Petitioner described other conditions that Anthony had developed prior to receiving the vaccines at issue. In March of 2000, when Anthony was eight years old, he developed sores inside his mouth, an irritated throat, a cough, and a fever. Id. at 74. Petitioner took Anthony to the doctor a month later, in April of 2000, to investigate the source of his headaches and the white patches covering his throat. Id. at 74. Anthony was diagnosed with viral pharyngitis, which eventually resolved on its own. Id. at 74. Petitioner testified that Anthony suffered with raised areas in his mouth intermittently for two months as well as fatigue from that viral illness. Id. at 75.

In June of that same year, petitioner sought treatment for dry patches that had persisted on Anthony's scalp for two months. Id. at 75. The patches gradually disappeared. Id. at 75.

Later that year, on December 9, 2000, ten days before Anthony's first vaccination, he required treatment for nasal congestion, a headache, chills, a low-grade fever, and swollen nasal membranes. Id. at 76.

On December 19, 2000, Anthony received his first hepatitis B vaccine, together with the MMR, IPV, and TDaP vaccines. Id. at 76. Petitioner testified that after receipt of these vaccines, Anthony's stool turned to a previously unseen clay color. Id. at 77. Petitioner, who routinely checked Anthony's stool, noticed the change in his stool color on a single occasion. Id. at 87.

On January 17, 2001, Anthony received a second hepatitis B vaccination. Id. at 77. After receiving the vaccine, Anthony experienced nausea and a loss of appetite. Id. at 77-78. Petitioner acknowledged that she did not take Anthony to see a doctor for some time, even though his nausea occasionally required his early departure from school. Id. at 90.

In September of 2001, Anthony developed shortness of breath after playing football. Id. at 80. Although Mrs. Reid acknowledged that Anthony had been diagnosed with possible asthma several years before he received his hepatitis B vaccines, she testified that this breathless episode in 2001 was the first time Anthony had trouble with his breathing; previously only his father and sister had been affected by asthma. Id. at 91. Mrs. Reid further testified that prior to this incident, the only symptoms of which Anthony had complained were fatigue and nausea. Id. at 81.

8

In October of 2001, petitioner took Anthony to see Dr. Megson. Id. at 81. She explained that Dr. Megson attributed the symptoms Anthony was experiencing as well as the decline in his academic performance to the hepatitis B vaccines he received. Id. at 81-82.

According to petitioner, Anthony developed new symptoms over time. Id. at 83. In particular, he started to experience numbness and tingling in the arm in which the vaccines had been administered. Id. at 83. Then, the numbness and tingling began in his other arm. Id. at 83. Anthony also began to complain of numbness in his legs. Id. at 83. Anthony occasionally had fainting spells. Id. at 83.

Certain chemicals and gas fumes would cause Anthony to shake and jerk. Id. at 83. Petitioner recounted an instance in which her use of Pine-Sol, a strongly scented cleaning agent, caused Anthony to tremble spasmodically. Id. at 83. When the movements did not stop, petitioner sought emergent care for Anthony. Id. Because his heart rate was significantly elevated on presentation to the emergency room, he was admitted for a couple of days. Id. at 83.

Petitioner eventually began to teach Anthony at home due to his heightened sensitivity to sounds, lights, and smells, as well as headaches. Id. at 84. The headaches would lead to Anthony's shaking, passing out, and not remembering what happened. Id. at 85. While these headaches have improved, they can still be triggered by certain smells such as cigarette smoke or gasoline. Id. at 85.

Mrs. Reid's testimony reflected her strong conviction that Anthony's many health issues stemmed from the vaccines he received. Although her insistence that Anthony developed difficulty breathing after the hepatitis B vaccinations was at variance with her own concession that Anthony had been diagnosed with probable asthma three years before his first vaccination, it is indicative of how persuaded petitioner is that she has offered an accurate recitation of events that implicated vaccine-related injury. The undersigned, however, questions the accuracy of petitioner's post-vaccinal account given her evident belief that Anthony's health was adversely affected by the vaccines he received. As a result, the undersigned accords less weight to those aspects of Mrs. Reid's testimony that are inconsistent with or conflict starkly with the contemporaneous medical records.

### 2. Mr. Anthony Reid, Sr.

Mr. Reid is petitioner's husband and Anthony's father. Tr. at 32. He testified that before Anthony received the subject vaccinations, he was an outgoing and healthy child. Id. at 33. Mr. Reid indicated that Anthony played little league football and was a cub scout. Id. at 33

9

Mr. Reid could not recall Anthony ever having asthma prior to his receipt of the hepatitis B vaccine. Id. at 33. But he acknowledged that he had suffered with asthma himself as a child, and outgrew it at around five or six years of age. Id. at 34. Mr. Reid was not aware of anyone in either his or his wife's family that had problems with asthma. Id. at 34.

Mr. Reid was not able to recall what the effects of Anthony's first hepatitis B vaccination were, or when those effects started to manifest. Id. at 34-35. He also was unable to recall when Anthony's symptoms began after his second hepatitis B vaccination. Id. at 35.

When asked to recall what were some of the symptoms Anthony experienced, Mr. Reid remembered that Anthony gained weight, developed twitches, became sensitive to light, and had problems with his bowel movements. Id. at 35. He elaborated that Anthony began to suffer from constipation, and his stool became clay-like and light brown in color. Id. at 35.

Mr. Reid remembered that Anthony had chronic headaches which were triggered by certain odors. Id. at 35. But, he was unable to recall when the headaches started in relation to Anthony's receipt of the hepatitis B vaccine. Id. at 36. Mr. Reid was able to remember, however, that Anthony would complain to him on occasion about his head hurting. He related to his wife those symptoms that Anthony reported to him because Mrs. Reid closely tended their children's health issues. Id. at 36.

Mr. Reid did recall Anthony's fainting episodes. Id. at 36. He testified that Anthony would lose consciousness and when he awakened, would not remember where he was. Id. at 36. Mr. Reid also recalled situations in which Anthony would have shaking spells and then pass out. On waking, Anthony would be aware only of how badly his head was hurting. Id. at 36-37.

Mr. Reid concluded his testimony acknowledging that while Anthony's symptoms have improved over the years, certain smells still trigger an adverse response from Anthony. Id. at 37.

Mr. Reid limited his testimony to those details about Anthony's health that he could remember. Based on his forthright and circumspect testimony, the undersigned found Mr. Reid to be a credible witness.

**Anthony Reid, Jr.**

Anthony Reid, Jr. is petitioner's son and the vaccinee for whom petitioner seeks Program compensation. Anthony testified that prior to receiving his

10

hepatitis B vaccines at the end of 2000, he was active and enjoyed in participating in sports such as flag football. Tr. at 22.

Anthony did not recall any immediate adverse effects after he received his second hepatitis B vaccination in January of 2001. Id. at 23. He recalled suffering from severe headaches after receiving the vaccine, but he could not remember when the headaches started. Id. at 23. The headaches varied in their severity and duration; sometimes they lasted for an hour, and at other times, they lasted for a period of weeks. Id. at 23. Severe headaches caused Anthony to black out. Id. at 23. He testified that upon regaining consciousness after his fainting episodes, he was uncertain about how he ended up in the particular location in which he found himself. Id. at 24.

Anthony also recalled having problems with constipation. Id. at 27. He testified that his stools were clay-colored and compacted. Id. at 28. He recalled alerting his mother to his symptoms but could not remember whether he saw the doctor for the problem. Id. at 28.

Anthony related that he suffered from seizure-like symptoms that occasionally caused paralysis and prevented him from getting out of bed or moving his limbs. Id. at 24. He could not remember how often these symptoms occurred, but over a period of time, these symptoms abated. Id. at 24-25. Periodically, Anthony would experience numbness and tingling in his arms and legs; these symptoms also subsided over time. Id. at 25.

Anthony described an episode during football practice when he developed difficulty breathing after running a lap. Id. at 29. He was later diagnosed with exercise-induced asthma which prevented him from playing sports for the rest of the school year. Id. at 29.

Anthony continued to experience severe headaches while in high school. Id. at 25. However, they were not as severe as they had been earlier, and they no longer triggered fainting episodes. Id. at 25. Anthony is now attending college with few of his earlier health problems. Id. at 26. He continues to have headaches periodically that are generally less severe than he had suffered previously; but he has had a few instances in which a severe headache has left him bedridden. Id. at 26.

Anthony's testimony was direct, succinct, and limited to what he could recall. He was a credible witness.

### C. Legal Standard and Analysis

11

In determining whether a petitioner is entitled to compensation under the Vaccine Act, a special master must consider "all . . . relevant medical or scientific evidence contained in the record," including "any diagnosis, conclusion, medical judgment, or autopsy or coroner's report . . . regarding the nature, causation, and aggravation of the petitioner's illness, disability, injury, condition, or death . . . ." § 300aa-13(b)(1)(A). The special master must consider "the record as a whole," § 300aa-13(a)(1), and cannot make a finding of entitlement based on the claims of the petitioner that are not substantiated by medical records or medical opinion. Id. The special master's decision regarding entitlement must include findings of fact and conclusions of law. § 300aa-12(d)(3)(A)(i).

Before an entitlement determination can be made in this case, the undersigned must first resolve the pending factual dispute regarding the circumstances surrounding Anthony's health before and after he received the vaccines at issue. This ruling is limited to resolving the parties' disagreement on the factual issues.

In a vaccine case, petitioner must prove, by preponderant evidence, the factual circumstances surrounding her claim. § 300aa-13(a)(1)(A). This evidentiary standard requires that the special master "believe that the existence of a fact is more probable than its nonexistence before [she] may find in favor of the party who has the burden to persuade the [special master] of the fact's existence. In re Winship, 397 U.S. 358, 371-72 (1970) (Harlan, J., concurring) (quoting F. James, Civil Procedure 250-51 (1965)).

To resolve factual disputes, the undersigned must determine what weight to assign the documentary record—which in this case includes contemporaneous medical records and laboratory test results—and what weight to assign the later-given oral testimony that includes certain factual details that are largely reflected in the documentary record created several or more years after the subject vaccinations were received. The case law instructs that oral testimony that conflicts with contemporaneous documentary evidence generally receives less evidentiary weight. See United States v. U.S. Gypsum Co., 333 U.S. 364, 396 (1948) ("Where [witness] testimony is in conflict with contemporaneous documents we can give it little weight[.]"); Montgomery Coca-Cola Bottling Co. v. United States, 615 F.2d 1525, 1528 (Fed. Cir. 1993) (stating conflicting oral testimony is afforded less evidentiary weight than written medical records). While a decision concerning whether to accord greater evidentiary weight to contemporaneous records or to later-given oral testimony falls "within the purview of the Special Master," Burns v. Sec'y of Dep't of Health & Human Servs., 3 F.3d 415, 417 (Fed. Cir. 1993), such decision must be rationally supported. Id.

Hence, the undersigned accords greater weight to the documentary records than the oral testimony to establish a timeline of events. Petitioner routinely

sought medical attention for Anthony for ailments that he was exhibiting at the time petitioner sought the treatment. Accordingly, the undersigned is persuaded that the documentary records more likely than not provide the more accurate timeline of events than the offered testimony.

## II. FINDINGS OF FACT

Having carefully considered the evidence presented, the undersigned makes the following findings. The findings pertain to five distinct timeframes: (1) Anthony's birth to date of first hepatitis B vaccination, (2) the date of the first hepatitis B vaccination, (3) the period between receipt of first hepatitis B vaccination and receipt of the second hepatitis B vaccination, (4) the date of the second hepatitis B vaccination, and (5) the period spanning from second hepatitis B vaccination to latest filed medical records in 2011.

### Birth to First Set of Vaccinations – March 25, 1992 to December 19, 2000

1. Anthony Reid, Jr. was born on March 25, 1992, to Linda and Anthony Reid, Sr. Pet'r's Ex. 16.

2. At birth, Anthony appeared a normal, well-infant. Pet'r's Ex. 16.

3. Before receiving the vaccines, Anthony was an active child who enjoyed playing sports. Tr. at 22.

4. Anthony experienced common childhood illnesses, including allergies, upper respiratory tract infections, ear infections, and a rash after receiving the chicken pox vaccine. Tr. at 74.

5. Anthony also had a history of bronchitis, sinus issues, and was diagnosed with questionable asthma. Tr. at 86.

6. In March of 2000, Anthony developed sores inside of his mouth, an irritated throat, a cough, and a fever; he was also diagnosed with viral pharyngitis, which eventually resolved on its own. Tr. 74.

7. In May of 2000, Antony was suffering from fatigue as a result of a viral illness, and from raised areas in his mouth that occurred intermittently for two months. Tr. at 75.

8. In June of 2000, Anthony was treated for dry patches that had persisted on his scalp for two months; the dry patches gradually disappeared. Tr. at 75.

9. On December 9, 2000, ten days before Anthony's first hepatitis B vaccination, he was treated for nasal congestion, a headache, chills, a low-grade fever, and swollen nasal membranes. Tr. at 76.

### First hepatitis B Vaccination together with MMR, IPV, and TDaP – December 19, 2000

10. On December 19, 2000, at eight years of age, Anthony received his first hepatitis B vaccine, together with the MMR, IPV, and TDaP vaccines. Tr. at 76.

### Health from December 19, 2000 to January 17, 2001

11. After receiving the vaccine, Anthony did not recall anything happening. Tr. at 23. Mr. Reid was also unable to recall whether Anthony experienced any adverse effects after his receipt of the vaccine. Tr. at 35.

### Second hepatitis B Vaccination – January 17, 2001

12. One month later on January 17, 2001 Anthony received his second hepatitis B vaccine. Tr. at 23.

### Health from January 17, 2001 – September 24, 2011

13. At some indeterminate time after Anthony received the second hepatitis B vaccine, he experienced nausea and a loss of appetite. Tr. at 77. Also, at some indeterminate time after Anthony received the second hepatitis B vaccine, his stool became clay-colored and compacted. Tr. at 27-28.

14. In February of 2001, nearly one month after Anthony's second hepatitis B vaccine, Mrs. Reid took him to see Dr. Gary Santora, a chiropractor, to whom Anthony presented with complaints of sharp, stabbing headaches. Pet'r's Ex. 26. No diagnostic impression was offered. Id.

15. In August of 2001, nearly eight months after his second hepatitis B vaccination, Anthony sought treatment at Patient First for complaints of tightness in his chest and difficulty breathing. Pet'r's Ex. 15.

16. In January of 2002, Dr. Megson conveyed to petitioner that Anthony's hair showed elevated levels of aluminum, arsenic, antimony, cadmium, lead, and thallium. Pet'r's Ex. 42. Later that January, during a return visit to Dr. Megson, petitioner was advised that Anthony's post-vaccinal bout of asthma could have been indicative of thimerosal toxicity. Pet'r's Ex. 42.

17. That same month in 2002, the Reids were advised by Dr. Donald Sanders of Midlothian Family Practice that no further medical care would be provided to Anthony in light of the excessive number of office and emergency care visits. Pet'r's Ex. 28.

18. In March of 2002, Anthony was diagnosed with heart palpitations. Pet'r's Ex. 3.

19. In May of 2002, Anthony was diagnosed with exercise-induced asthma. Pet'r's Ex. 17.

20. In April of 2003, more than two years after his receipt of the second hepatitis B vaccine, Anthony was evaluated by Dr. Taylor for possible seizures and chest pain. Pet'r's Ex. 19. The CT scans and EEG performed were found normal. Id. Anthony's symptoms were attributed to either anxiety or hyperventilation, but not to seizures. Pet'r's Ex. 49.

21. In August of 2003, Anthony was diagnosed as having probable floppy eyelid syndrome and was prescribed antihistaminic eye drops. Pet'r's Ex. 31.

22. In September of 2003, Anthony was evaluated for his reported shaking episodes, chronic fatigue, dry eyes, stomach aches, and periods of body numbness. Pet'r's Ex. 42.

23. In October of 2003, Anthony was seen again for complaints of collapsing, numbness, twitching, paralysis, and unresponsiveness. Pet'r's Ex. 30.

24. In November of 2004, Anthony sought medical treatment for questionable seizure activity. Pet'r's Ex. 50. One month later, Anthony sought medical attention for a fainting episode. Id.

25. In April of 2005, Anthony underwent a neuro-psychological evaluation that revealed mild attentional issues and impaired fine motor coordination. Pet'r's Ex. 43.

26. In March of 2006, Anthony was examined by a pediatric neurologist for a migraine variant, parasomnia, and restless leg syndrome. Pet'r's Ex. 43.

27. In November of 2006, Anthony received medical attention for a painful headache and nosebleeds. Pet'r's Ex. 51.

28. In November of 2009, more than eight years after Anthony's receipt of his last hepatitis B vaccine, Anthony had a routine sports physical, at which time the examining doctor noted that he had not sought treatment for complaints or problems for several years. Pet'r's Ex. 58.

29. In March of 2010, Anthony sought treatment for pain resulting from what the examining doctors suspected was either a tension headache or a migraine. Pet'r's Ex. 56.

30. In September of 2011, Anthony again sought treatment for facial pain, numbness, and headache. Pet'r's Ex. 59.

31. Anthony has attended college with very few of his earlier health problems, except an occasional headache. Tr. at 25-26. The numerous CT scans Anthony has received have failed to reveal any abnormalities. Id.

32. Because extensive testing has failed to reveal any irregularities, various of Anthony's treaters have questioned whether his ailments have an emotional or anxiety-related underpinning.

The medical significance of these fact findings must be addressed by the parties' experts. Upon this case's transfer to another special master, the parties shall contact chambers, **on or before June 10, 2013**, to schedule a status conference to discuss this ruling and further proceedings as appropriate.

**IT IS SO ORDERED.**

s/Patricia E. Campbell-Smith
Patricia E. Campbell-Smith
Chief Special Master